TM:EAG/AL/AH
F.#2011R00006

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

FILED
IN CLERK'S OFFICE
U.S. DISTRICT COURT E.D.N.Y.
★ AUG 03 2012 ★
BROOKLYN OFFICE

- - - - - - - - - - - - - - - - - -X

UNITED STATES OF AMERICA

    - against -

ALBERT GUIDO,

           Defendant.

I N F O R M A T I O N

Cr. No. 12-491
(T. 18, U.S.C.,
§§ 1959(a)(5) and
3551 et seq.)

- - - - - - - - - - - - - - - - - -X

THE UNITED STATES ATTORNEY CHARGES:

INTRODUCTION

      At all times relevant to this Information, unless otherwise indicated:

The Enterprise

      1.    The members and associates of the Bonanno organized crime family of La Cosa Nostra constituted an "enterprise," as defined in Title 18, United States Code, Section 1959(b)(2), that is, a group of individuals associated in fact (hereinafter, the "Bonanno crime family" and the "enterprise"). The enterprise constituted an ongoing organization whose members functioned as a continuing unit for a common purpose of achieving the objectives of the enterprise. The Bonanno crime family engaged in, and its activities affected, interstate and foreign commerce. The Bonanno crime family was an organized criminal

group that operated in the Eastern District of New York and elsewhere.

2. La Cosa Nostra operated through organized crime families. Five of these crime families - the Bonanno, Colombo, Gambino, Genovese and Luchese crime families - were headquartered in New York City and supervised criminal activity in New York, in other areas of the United States and, in some instances, in other countries. Another crime family, the Decavalcante crime family, operated principally in New Jersey, but from time to time also in New York City.

3. The ruling body of La Cosa Nostra, known as the "Commission," consisted of leaders from each of the crime families. The Commission convened from time to time to decide certain issues affecting all of the crime families, such as rules governing crime family membership.

4. The Bonanno crime family had a hierarchy and structure. The head of the Bonanno crime family was known as the "boss." The Bonanno crime family boss was assisted by an "underboss" and a counselor known as a "consigliere." Together, the boss, underboss and consigliere were the crime family's "administration." With the assistance of the underboss and consigliere, the boss was responsible for, among other things, setting policy and resolving disputes within and between La Cosa Nostra crime families and other criminal groups. The

administration further supervised, supported, protected and disciplined the lower-ranking participants in the crime family. In return for their supervision and protection, the administration received part of the illegal earnings generated by the crime family. Members of the Bonanno crime family served in an "acting" rather than "official" capacity in the administration on occasion due to another administration member's incarceration or ill health, or for the purpose of seeking to insulate another administration member from law enforcement scrutiny. Further, on occasion, the Bonanno crime family was overseen by a "panel" of crime family members that did not include the boss, underboss and/or consigliere.

    5.  Below the administration of the Bonanno crime family were numerous "crews," also known as "regimes" and "decinas." Each crew was headed by a "captain," also known as a "skipper," "caporegime" and "capodecina." Each captain's crew consisted of "soldiers" and "associates." The captain was responsible for supervising the criminal activities of his crew and providing the crew with support and protection. In return, the captain often received a share of the crew's earnings.

    6.  Only members of the Bonanno crime family could serve as a boss, underboss, consigliere, captain or soldier. Members of the crime family were referred to on occasion as "goodfellas" or "wiseguys," or as persons who had been

3

"straightened out" or who had their "button." Associates were individuals who were not members of the crime family, but who nonetheless engaged in criminal activity for, and under the protection of, the crime family.

       7. Many requirements existed before an associate could become a member of the Bonanno crime family. The Commission of La Cosa Nostra from time to time limited the number of new members that could be added to a crime family. An associate was also required to be proposed for membership by an existing crime family member. When the crime family's administration considered the associate worthy of membership, the administration then circulated the proposed associate's name on a list given to other La Cosa Nostra crime families, which the other crime families reviewed and either approved or disapproved. Unless there was an objection to the associate's membership, the crime family then "inducted," or "straightened out," the associate as a member of the crime family in a secret ceremony. During the ceremony, the associate, among other things: swore allegiance for life to the crime family above all else, even the associate's own family; swore, on penalty of death, never to reveal the crime family's existence, criminal activities and other secrets; and swore to follow all orders issued by the crime family boss, including swearing to commit murder if the boss directed it.

## Methods and Means of the Enterprise

8. The principal purpose of the Bonanno crime family was to generate money for its members and associates. This purpose was implemented by members and associates of the Bonanno crime family through various criminal activities, including drug trafficking, robbery, extortion, fraud, illegal gambling and loansharking. The members and associates of the Bonanno crime family also furthered the enterprise's criminal activities by threatening economic injury and using and threatening to use physical violence, including murder.

9. Although the primary purpose of the Bonanno crime family was to generate money for its members and associates, the members and associates at times used the resources of the family to settle personal grievances and vendettas, sometimes with the approval of higher-ranking members of the family. For those purposes, members and associates of the enterprise were asked and expected to carry out, among other crimes, acts of violence, including murder and assault.

10. The members and associates of the Bonanno crime family engaged in conduct designed to prevent government detection of their identities, their illegal activities and the location of proceeds of those activities. That conduct included a commitment to murdering persons, particularly members or

5

associates of organized crime families, who were perceived as potential witnesses against members and associates of the enterprise.

11. Members and associates of the Bonanno crime family often coordinated criminal activity with members and associates of other organized crime families.

### The Defendant

12. At all times relevant to this Information, the defendant ALBERT GUIDO was an associate within the Bonanno crime family.

### COUNT ONE
(Conspiracy to Commit Murder in-Aid-of Racketeering)

13. The allegations contained in paragraphs 1 through 12 are realleged and incorporated as if fully set forth in this paragraph.

14. At all times relevant to this Information, the Bonanno crime family, through its members and associates, engaged in racketeering activity, as defined in Title 18, United States Code, Sections 1959(b)(1) and 1961(1), that is, acts involving murder, extortion and gambling that are chargeable under New York State Penal Law and punishable by imprisonment for more than one year, and acts indictable under Title 18, United States Code, Sections 892, 893 and 894 (the making, financing and collecting of extortionate extensions of credit), Title 18, United States

associates of organized crime families, who were perceived as potential witnesses against members and associates of the enterprise.

11. Members and associates of the Bonanno crime family often coordinated criminal activity with members and associates of other organized crime families.

### The Defendant

12. At all times relevant to this Information, the defendant ALBERT GUIDO was an associate within the Bonanno crime family.

### COUNT ONE
(Conspiracy to Commit Murder in-Aid-of Racketeering)

13. The allegations contained in paragraphs 1 through 12 are realleged and incorporated as if fully set forth in this paragraph.

14. At all times relevant to this Information, the Bonanno crime family, through its members and associates, engaged in racketeering activity, as defined in Title 18, United States Code, Sections 1959(b)(1) and 1961(1), that is, acts involving murder, extortion and gambling that are chargeable under New York State Penal Law and punishable by imprisonment for more than one year, and acts indictable under Title 18, United States Code, Sections 892, 893 and 894 (the making, financing and collecting of extortionate extensions of credit), Title 18, United States

Code, Section 1951 (extortion), and Title 18, United States Code, Section 1955 (gambling).

15. On or about February 16, 1989, within the Eastern District of New York and elsewhere, the defendant ALBERT GUIDO, together with others, as consideration for a promise and agreement to pay something of pecuniary value from, and for the purpose of gaining entrance to and maintaining and increasing position in, the Bonanno crime family, an enterprise engaged in racketeering activity, did knowingly and intentionally conspire to murder Michele Maniscalco, in violation of New York Penal Law Sections 125.25(1) and 105.15.

(Title 18, United States Code, Sections 1959(a)(5) and 3551 et seq.)

## COUNT TWO
(Attempted Murder in-Aid-of Racketeering)

16. The allegations contained in paragraphs 1 through 12 are realleged and incorporated as if fully set forth in this paragraph.

17. At all times relevant to this Information, the Bonanno crime family, through its members and associates, engaged in racketeering activity, as defined in Title 18, United States Code, Sections 1959(b)(1) and 1961(1), that is, acts involving murder, extortion and gambling that are chargeable under New York State Penal Law and punishable by imprisonment for more than one year, and acts indictable under Title 18, United States Code,

7

Sections 892, 893 and 894 (the making, financing and collecting of extortionate extensions of credit), Title 18, United States Code, Section 1951 (extortion), and Title 18, United States Code, Section 1955 (gambling).

18. On or about February 16, 1989, within the Eastern District of New York and elsewhere, the defendant ALBERT GUIDO, together with others, as consideration for a promise and agreement to pay something of pecuniary value from, and for the purpose of gaining entrance to and maintaining and increasing position in, the Bonanno crime family, an enterprise engaged in racketeering activity, did knowingly and intentionally attempt to murder Michele Maniscalco, in violation of New York Penal Law Sections 125.25(1), 110.00 and 20.00.

(Title 18, United States Code, Sections 1959(a)(5) and 3551 et seq.)

LORETTA E. LYNCH
UNITED STATES ATTORNEY
EASTERN DISTRICT OF NEW YORK

BY: _____
ACTING UNITED STATES ATTORNEY
PURSUANT TO 28 C.F.R. 0.136